And at this time, we'll hear Berrie versus the Board of Education. Good morning. Good morning, may it please the court. My name is Howard Shragen and we represent the appellant Gregory Tyrone Berrie. In his appeal of the district court's decision granting summary judgment in favor of the defendants and dismissing his race, discrimination, and retaliation claims. I'm going to focus my comments this morning on three key points that we believe were error in the court's decision granting summary judgment motion. First, the district court made an improper factual and credibility determination when it determined that what's been known in this case as the hockey puck incident was accidental and not intentional. And this was a critical decision because as the law in this circuit is clear, even one incident involving a physical assault in a hostile work environment case can support a claim even if it's not pervasive. What's the evidence in the record that it was intentional? The evidence in the record that it was intentional are, number one, Mr. Swift went to the large gymnasium, saw a group of students playing hockey, purposely decided not to go into that gymnasium, went into the next gymnasium, which was Mr. Berrie's class, to join his hockey group for the first time ever, which suggests that he was selectively targeting Mr. Berrie. He admitted that he hit the hockey puck. The hockey puck was hit in the direction of Mr. Berrie. It hit him in the head. Afterwards, he smirked at Mr. Berrie and said, I did it. We have evidence that he's an experienced hockey coach and hockey player. So he would have had potentially the skill to do it, or at least- How far away from Berrie was he when he did it? The testimony is unclear, but Mr. Berrie suggested that he was about ten feet away. It was a smaller gymnasium, but it was never clearly established how far it was. Defendants, I believe, said it was further, probably the length of this room. Also, there was evidence in the record that he had told another teacher that at hockey practice one night, he envisioned her husband's face on a hockey puck, which suggests that, for whatever reason, he's attributing his anger, or whatever it may have been, to people in hockey pucks. Didn't he say he was only playing hockey for a year? I don't recall that. I probably would have seen that. Was he an experienced hockey player? He was a hockey player, and he was a hockey coach. My understanding from the testimony is- For his child. Yes, but he believed he also played in a men's league, because I think he said the day before the hockey puck incident, he was playing at hockey late at night that night. I thought he had also said he had only been playing for a year or so. To be honest, I don't remember that testimony, but I was always under the impression that he'd been playing longer. This was a ball that was lifted up into the air, right? That's- Correct. He'd have to be really good, wouldn't he? Admittedly, yes, and that's something that I've thought about. I think that potentially gives him plausible deniability. So admittedly, he's not Wayne Gretzky. If he missed this head, he might have hit one of the students. Well no, the way the ball, the trajectory, it was only going towards. The students were playing hockey over here, and Mr. Berry was over there on a ladder fixing a piece of equipment in the gym. So it wasn't like he was mixed in with the students. He was on a ladder. So the hockey puck had to have been hit up in the air. It was lofted. Yes. Must have been more than ten feet based on the way you're describing it. I'm just telling you what my client's testimony is. Again, admittedly, he's not Wayne Gretzky, and let's assume that he's not a professional hockey player. So it gives him plausible deniability. What I mean by that is, he hits the puck across, angles it right at his head. Maybe he meant to hit it next to him to scare him. All of a sudden, it actually hits him. So then he can step back and say, you're just a pine. There's no way I could have intentionally hit the puck across the gym and hit him in the head. But it still doesn't change the fact that he intentionally hit it in his direction at him. The proof that it was intentional is that it was done in such a way that he could deny that it was intentional. There's something wrong with that. I think that's just the effect of what happened. I don't think he did it in a way that he can deny that it was intentional. I think he went in and it was intentional. The fact that it was a one in a million shot doesn't change that it was intentional. The fact that it's a one in a million shot makes it overwhelmingly likely that it's an accident. No. What I believe, and what the evidence shows, is that he intentionally hit it in his direction. It happened to hit him in the head. It doesn't change the intentionality. If it would have knocked right next to his head on the wall to startle him, maybe knock him down, send a message. Same impact. It happened to hit him in the head. What were the other two pieces of evidence that were compelling that this was a hostile work environment? I thought you said there were three things you wanted to mention. The other three things. Well, that was the one piece. The second piece is we believe that the district court negated some of the evidence of racial animus and then used that to decide that there was no bias in this case, which of course is a key component of a race discrimination case. The first, before Mr. Berry was ever assigned to Principal Swift's school, he sent an email complaining about his assignment saying that I don't want the tired, hungry, and oppressed at my school. It was a reference to the poem on the Statue of Liberty, but he specifically changed the word huddled masses to oppressed. How long was that before the Hockey Incident? I think it was about two years. And- Another thing, I just want to ask you about this. Sure. One of the things you point to is a statement by the union representative at that meeting where you claimed that it was said that the principal was trying to get rid of Tyrone and how fast you're going to get him out of here. Right? That's Coffin is her name, right? Donna Coffin? Right. You're familiar with this, right? It's all over your briefs. Yes. But my reading of that is that he was quoting what other people were saying to him. Correct. So what is it? I mean, that's correct. I thought you were saying, you said it a number of times, that's what he said, and that shows racial animus. But my reading of her notes of that meeting, that's in quotation marks that the principal recounted. Am I wrong about that? No. You are right. And I don't believe we relied on that for evidence of racial animus. Because when reviewing the record, I believe your Honor's position is correct. And I believe he even sort of acknowledged that they weren't trying to get rid of him at the time. Before your time runs out, what do you do with the Mecca Ward investigation? It seems rock solid, and if it is, you lose, right? It does seem rock solid. However, you have to look at what happened before it, and that's what we posited in our brief. First, the superintendent of the district does an investigation and finds that the hockey puck- You're relying on this taint argument? Correct. That would suggest they could never get it right, right? In other words, even if the first investigation wasn't very good, and then they had, I don't know, the best investigators in the world, it wouldn't matter, it was tainted, right? Not necessarily. If it was an independent investigator, an independent law firm, then I think there's less of a chance of taint. But when you have your boss do an investigation, conclude one thing, and then essentially say, here, my subordinate, you're going to do another investigation to double check my work. And then her investigation comes to the same conclusion. I don't think it's that far to say that she may have been biased, or at least influenced to come to that conclusion. You have reserved three minutes rebuttal. I have, Your Honor. Thank you. May it please the court. My name is Maurizio Saviato. I represent the defendant of Pelley's in this case. And this is a pretty simple issue before the court. This court addressed it earlier this year in the Sagi case, which I believe is dispositive of all of the issues. And conspicuously, plaintiff doesn't even address that case in his reply brief at all, nor does he really address Hicks, except to misquote it. This is a case where there is an instance of a complaint of discrimination in the workplace in 2006. It is investigated. The plaintiff confirms he's happy with the results. There were remedial measures taken. Seven years pass, not a single complaint. Then there's the email, and the hockey incident, and the handing of the article. All three are investigated. All three result in remedial measures being implemented. All of the elements of the Farringer defense are satisfied. The district has a policy, it's posted, it's disseminated. It's obvious plaintiff knows of it, because in 2006, he complained to the Title IX officer about a single comment that was made to him, and it was resolved. Following the results of all the investigations, Mr. Berry retains counsel. A new complaint is brought forth to the district, and they have the McWhort investigation. At this point in time, Mr. Berry then raises all new complaints of discrimination going back to 2002, of which he's never availed himself of the district's anti-discrimination policy and complaint procedures. The district court was correct in how they set up their analysis and their decision. They looked at what are the incidents that he complained of, what did the district do, did they have a policy that addressed it, were the investigations adequate, and did they implement remedial measures? And the answer is yes. All the other incidents came up after the fact, and he never complained about them. Those are not actionable, and they're dismissible. They're also dismissible for the reason that there's not a single adverse action here. The only adverse action that's alleged is the WOMAC evaluation report. It has ten categories. The plaintiff is rated above average, in other words excellent, in six of the ten, and average in the other four. There's not a single rating that is adverse to the plaintiff or critical of him. So there's no adverse action. The statement that he's relying upon, here's what I think the court needs to focus on too, with respect to the hockey incident. WOMAC, at that time, WOMAC review, everybody knew that he was filing charges of discrimination, right? I don't know that you can say that everybody knew. I don't think there's any clear- The assistant superintendent, WOMAC? No. No? He's the assistant principal, I believe. Finnelli is the assistant superintendent. Okay, well, would an assistant principal know, if you think about it? He may have known, but he was never deposed. So we don't, there's no, I don't believe there's any direct answer in the record as to his knowledge. But even assuming that he does, if the argument is he got appointed because he was also a black administrator to evaluate him, that doesn't fly, because he evaluated him previously before he ever made any complaints. He was somebody that was in his purview of people to evaluate, and there are documentations in the record. WOMAC attends his class December 5th, 2013, which is a month after the MAC award report. So he's going to know that- I don't dispute- There's claims of discrimination all over the place. I don't dispute that he was aware of it. But so then what's the adverse action? He got a nice evaluation. Well, he was, I know that the, I think the superintendent in his report said he had to take anger management training, right? But that was changed by a MAC award? Correct. And the reason for that is Mr. Barry, after the hockey incident, and if I may just regress and then I'll answer on his question, it doesn't matter if it's intentional. It has to be motivated by his race. And counsel stood here before the court, didn't raise that issue once, didn't articulate a single fact to demonstrate that a high school principal who joins a hockey game, lobs a ball to ice it to the other side, he testified that he did it to let the other team get the ball. And it accidentally hit the plaintiff. Student witnesses said it looked like an accident. There's even some testimony that the ball may have deflected off another stick. There's no evidence it was discriminatory. The only evidence the plaintiff points to is the email two years earlier where Swift says basically I want the opportunity to choose my own staff. I don't want to get the teacher that you're transferring out of the high school. But the three major incidents are kind of close to each other. February 2013 is the Iantorno email. Correct. And April 2013 is the hockey incident. And May 2013 is the Coates article sent by Finnelli, right? Yes. So those are kind of compressed in time. They are. Why can't there be an inference drawn that there's something going on here? Because the record is replete with evidence that there's no discriminatory items towards any of them. And even if there was, there's no liability because the district has a founder defense. They investigate it. They implement the remedial measures. Cases is dismissible for that reason alone. And the district court was correct to do that. And in terms of finding the lack of discriminatory intent, I go back to the Sajai case earlier this year. All right? It can't just be a metaphysical belief on the plaintiff's part that he was discriminated against. I mean, if you look through some of his other complaints, one of the other ones that he brought up to McWard was in 2002, I believe the superintendent denied me tenure and gave me an extra probationary year because his daughter asked me to be a chaperone on a field trip. All right? The investigation at McWard, she went back, she found the docs in 2002, plaintiff complained that his pay was reduced. His schedule was reduced three-fifths along with other teachers in his section for budgetary reasons. And the other teacher happened to be white. He claims that he found feces in the bathroom in the office and claims that it was directed at him, lo and behold, what does discovery reveal? It was election night the night before. There were hundreds, if not thousands of people in the building, and they all had access to it. Somebody's- Coffee pot though. What's that? It wasn't his own coffee pot? It wasn't a general use coffee pot? That is unclear. He says it's his. It's in the office. I believe it's a communal coffee pot. That is strange, but there's no evidence as to who did it, when it occurred, if there was urine in there. because he never complained to anybody about it. He never took the coffee pot and showed anybody. It's just something that he claims happened. And the court was correct. In regard to the retaliation issue, the one thing I wanted to ask you about was, there's the email from Swift asking for the Pecola to send him a letter, and at the end he says, the district wants him out of here, or words to that effect. Isn't that a basis to infer retaliatory intent? There's, for what action? These occurred well after the hockey incident. So they can't serve as a motive for retaliation for the hockey incident, which is the only incident that Swift was involved in. And the appellant's brief misquotes the timing of those emails. I confess I don't remember the timing very well. My sense was it was after the hockey incident, but- There were several emails by Pecola where she's complaining about Barry, and Swift never responds to them, that I believe was the fourth complaint that she raises. And Swift says, basically, if you want to make a complaint, you got to write it up. You got to follow the procedure like everybody else. He wasn't soliciting her to make complaints against Barry. He didn't respond to the first three complaints she made. And then when she made a fourth one, he told her to follow the policy, write it up. Right, but the question is whether it speaks to retaliatory intent when he says the district wants- For what action, Your Honor? Well, I guess possibly earlier complaints and about the hockey incident. Well, there are no other complaints against Swift other than the hockey incident. What you have is a high school principal that joined in a game. You're correct. He had about one year experience playing hockey with his son, coaching, and then played in a night intramural league. He hit the ball, it deflected, it hit Plaintiff in the head. There's not a single evidence that this was discriminatory, biased, racially motivated, or retaliatory for any protected activity that occurred beforehand. After no other questions, I'll rest on my brief. Thank you. Your rebuttal. Couple of quick points. Your Honor, I agree with you wholeheartedly. The issue of retaliation with respect to what we'll call the conspiracy between Principal Swift and Pecola is laid bare by that text message. Yeah, but can you answer his question, which I couldn't? What does it retaliate for? Retaliation for the first formal letter complaining, the notice of claim, and the lawsuit filed against. Remember, the district was fed up with him. The date of that email where it says the district wants him out of here? April 10th, 2015. The email, it says the district is fed up with him. Why? Because he's been complaining, he's been a pain in the butt. So now, yes, Ms. Pecola had complained previously. But in terms of the complaint against Swift, counsel points out that it was just a hockey incident that was complained about a long time before, two years before. This is not necessarily just about Swift, it's about the district being fed up because he's filing complaints against the district. And the district using Swift and Pecola to do their bidding. So now, before they were unofficial complaints, and now the district is saying, make them formal, sign them, submit them in writing, because we're fed up with him. And we want to build a record to get rid of him. I don't think it's that far of a stretch to find retaliatory anatomy in that. And you need to find the adverse action, though. What's the adverse action? Well, that's a key point, because they keep pointing towards no adverse action in terms of conditions, okay? The law is clear in a retaliation context. No, no, I understand Burlington, this is standard, but still, where's the adverse action here? Okay, first he complains about the iron tornado email, and he gets hit in the head with a hockey puck. Then he complains about that, and he gets an article about the plight of black professionals dealing with prejudice, which he believed was indicative that he's an angry black man. Which, by the way, as Judge Roney pointed out, the superintendent sort of confirmed that when he suggested he go to anger management. Then after he complained- Is it true, though, of Finnelli and Berry? It says he was his coach and mentor when he was younger. Is that true that Finnelli had a special place in his life? He did, yes. What was it? What you just said. Coach, mentor, arguably friend. But I will tell you, because I've asked Mr. Berry about that, because it does seem inconsistent. And he said that as time went on and the things that happened at the school, particularly in the last couple of years, he began to change his impression about Finnelli and what his true intentions are. I can't get into Mr. Berry's head, but yes, they have a long and previously positive relationship. We're starting to get into things that are not in the record. Correct. The one other point on the WOMAC evaluation, in terms of an adverse employment action, I think the timing there is critical. So first, there's an oral examination, and for the first time, there's negative comments about his performance. That's on December 5th, 2013. Because of that, it spurred him to file, may I finish my answer? You can finish the sentence. It spurred him to file his formal notice of claim on December 12th, a month and a half. Well, February 25th, the written report was then put out, which was all positive. So there was an intervening cause which changed what would have been a retaliatory or negative evaluation and could possibly have turned it into a positive evaluation. So I think there's more to it than just saying the end result was positive. Thank you, your honors. We'll reserve decision. The case of Shin versus American Airlines is taken on submission. And the case of United States versus Zintner is taken on submission. That's the last case on calendar. Please adjourn.